# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MATTHEW B., by and through :
his parents, :
           Plaintiffs, :
    v. : **3:17-CV-2380**
                   : **(JUDGE MARIANI)**
PLEASANT VALLEY SCHOOL :
DISTRICT, :
            :
           Defendant. :

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiffs, Matthew B ("Student"), by and through his parents, Sherry and Bryan B

("Parents"), filed this action against Defendant Pleasant Valley School District ("District") for

alleged violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§

1400 *et seq.*[1] Plaintiffs filed the instant action to appeal the decision of the Due Process

---

[1] Plaintiffs also present claims under Section 504 of the Rehabilitation Act ("Section 504") and the Americans with Disabilities Act ("ADA"). However, Plaintiffs only set forth arguments under IDEA, and they do not provide any additional support for violations under Section 504 or the ADA, other than to the extent that a violation under IDEA also constitutes a violation under Section 504 and the ADA.

With respect to the Section 504 claim, the Court is mindful that a violation of Section 504 is not "a *per se* violation" of IDEA, or vice versa. *See Andrew M. v. Del. Cty. Office of Mental Health & Retardation*, 490 F.3d 337, 349 (3d Cir. 2007) ("[E]ven in cases brought under the IDEA . . . a plaintiff must still prove that there was a violation of [Section 504 of] the RA."). As such, Plaintiffs must still prove the elements under Section 504, though they may rely on the same facts in doing so. *See id.* Here, Plaintiffs have not put forth any separate discussion of the claims under Section 504 as required, and Plaintiffs rely solely on the IDEA claim.

With respect to the ADA claim, based on a review of the administrative hearing record (Doc. 14) and the complaint filed at the administrative level (Doc. 14-24), an ADA claim was never raised, and therefore, Plaintiffs failed to exhaust their administrative remedies. *See, e.g., Swope v. Cent. York Sch. Dist.*, 796 F. Supp. 2d 592, 601 (M.D. Pa. 2011) ("Because Plaintiff's ADA and Section 504 claims were not at issue during the due process hearing, Plaintiff failed to exhaust his administrative remedies."); *Hesling v. Avon Grove Sch. Dist.*, 428 F. Supp. 2d 262, 277 (E.D. Pa. 2006) ("[T]he exhaustion requirement remains

Hearing Officer pursuant to IDEA. (Doc. 1). Plaintiffs specifically appealed the Hearing

Officer's remedy for partial denial of free appropriate public education ("FAPE") for four years

and complete denial of a FAPE for one year. (Id.).

A due process hearing was conducted over the course of several sessions in June

and August of 2017. On September 25, 2017, Pennsylvania Special Education Hearing

Officer Ford ("Hearing Officer") issued a decision, ruling in favor of the Parents in part and in

favor of the District in part (Doc. 14-2, at 2), and finding that the District denied Matthew a

FAPE during the 2012-13 through 2015-16 school years with respect to an appropriate

functional program and appropriate transitional supports, but not with respect to his academic

program. The Hearing Officer also found that the District denied Matthew a FAPE completely

during the 2016-17 school year. Accordingly, Hearing Officer Ford held that Matthew was

entitled to compensatory education that required the District to fund the instructional

components of a transition program that teaches independent living or vocational skills for a

period of no more than two years. (Doc. 14-2, at 29).

The District and Plaintiffs have filed cross-motions for judgment on the administrative

record. (Docs. 30, 33). The District also moved, in the alternative, for summary judgment.

(Doc. 33). The District challenges the Hearing Officer's determination that the District denied

Matthew a FAPE and that Matthew is entitled to any compensatory education. (Doc. 34, at

unsatisfied, since . . . [the ADA claims] were never raised at the IDEA due process hearings.").
Accordingly, further discussion of the 504 and ADA claims is not merited.

2

5). The District also seeks fees from Plaintiffs pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(III). (Doc. 34, at 60). On the other hand, Matthew challenges the Hearing Officer's determination of compensatory education on the grounds that the Hearing Officer failed to award sufficient and appropriate relief. (Doc. 31, at 7). Matthew also seeks attorneys' fees from the District. (*Id.* at 30). The parties have fully briefed their motions and submitted reply briefs. Accordingly, the motions are ripe for disposition. For the reasons set forth below, the Court will deny the District's motion, grant Plaintiffs' motion, affirm the Hearing Officer's decision with respect to the denial of a FAPE, reverse the Hearing Officer's decision with respect to compensatory education, and remand the case to the Hearing Officer for a determination of an appropriate remedy consistent with this Opinion.

## II. STANDARD OF REVIEW

The IDEA permits "[any] party aggrieved by the findings and decision" of the state administrative hearing "to bring a civil action" in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2)(A). In reviewing the complaint, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The United States Supreme Court has construed 20 U.S.C. § 1415(i)(2)(C) to require district courts to give "due weight" to the administrative proceedings, while being careful to avoid replacing its

3

"own notion of sound educational policy for those of the school authorities [that] they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).

Consequently, a district court's review of a hearing officer's decision in an IDEA case is "subject to a unique standard of review." *N.M. v. Cent. York Sch. Dist.*, No. 09-969, 2010 WL 4867552, at *4 (M.D. Pa. Sept. 10, 2010). "Due weight" requires the district court to conduct a "modified *de novo* review," under which findings of fact from the administrative proceedings "are to be considered *prima facie* correct." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003) (quoting *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995)). Under the standard, a court may disagree with the facts found by a hearing officer but must explain any such divergence from the administrative findings. *Id.* (citing *MM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 530-31 (4th Cir. 2002)). *Id.* Additionally, "a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Shore Reg'l High Sch. Bd. Of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)) (emphasis in original). A hearing officer's conclusions with respect to whether a school district fulfilled its FAPE obligations, whether the IEP conferred a meaningful benefit, and whether the IEP is appropriate are questions of fact. *See P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) (citing *S.H.*, 336 F.3d at 269-70); *see also Carlisle Area Sch.*, 62 F.3d at 526. The

4

party challenging the administrative decision in the district court bears the burden of persuasion. *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

In contrast, the district court's review of a hearing officer's findings of law is plenary, and no deference is given to the hearing officer's legal holdings. *See Jana K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014) (citing *Warren G. v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80, 83 (3d Cir. 1999)). A hearing officer's conclusions regarding compensatory education are considered findings of law subject to the district court's plenary review. *See P.P.*, 585 F.3d at 735.

### III. BACKGROUND

At the administrative level, the Hearing Officer, after receiving evidence and hearing testimony from the parties, issued a decision (Doc. 14-2) containing findings of fact and legal conclusions.[2] They are recounted below.

Matthew is a "child with a disability," specifically with Autism and Speech and Language impairments. (*Id.* at ¶ 1). In February 2017, through an independent educational evaluation, Matthew also met the criteria for a child with an intellectual disability. (*Id.* at ¶ 2).

During the 2008-09 and part of the 2009-10 school years, Matthew received special education pursuant to the IEP dated March 5, 2009, from that date, until March 3, 2010. (*Id.* at ¶ 11). The March 5, 2009 IEP included goals with respect to math, writing, speech and

---

[2] The Court notes that neither party presented any additional evidence. Therefore, the Court will rely solely on the factual background presented in the Hearing Officer's decision and the accompanying record from the due process hearing.

language, and social and behavioral skills. (*Id.* at ¶¶ 12-16). In addition, it provided that Matthew would receive specially designed instruction (SDI), two thirty-minute speech and language therapy sessions per six-day cycle, and supplemental learning support. (*Id.* at ¶¶ 17-19).

On March 3, 2010, Matthew's IEP team reconvened to update his IEP ("2010 IEP"), which was approved by his Parents via a Notice of Recommended Educational Placement ("NOREP"), and subsequently issued by the District on that same day. (Doc. 14-2, at ¶ 20). The 2010 IEP included a section for transition services, where "the IEP team indicated that the Student had no plans for post-secondary education at that time, but would require supported employment when the Student was old enough for employment, and listed supported employment as an employment goal." (*Id.* at ¶ 21). The 2010 IEP "also indicated that the Student had taken a Career Interest Picture Inventory, called for the Student to complete another interest inventory, and improve self-advocacy, direction-following, and social skills. These were not goals, but rather were listed as services or activities related to the Student's transition needs." (*Id.* at ¶ 22). Regarding transition, the 2010 IEP indicated "that the Student's goal was to live with the Parents after graduation, and listed living with the Parents as an independent living goal." (*Id.* at ¶ 23). The 2010 IEP provided reading, math, writing, and social skills goals, modification and SDIs, and supplemental learning support that were substantively similar to those provided in the 2009 IEP. (*Id.* at ¶¶ 24-30).

Matthew was educated pursuant to the 2010 IEP for the remainder of the 2009-10 school year, and into the 2010-11 school year. (*Id.* at ¶¶ 31-32).

On January 31, 2011, the District sought to reevaluate Matthew, to which Matthew's Parents subsequently consented. (Doc. 14-2, at ¶ 33). Six days later, the District drafted a Reevaluation Report ("2011 RR"), which "concluded that the Student was at the primer level in reading and the 3rd grade level in math." (*Id.* ¶ at 35). Moreover, the 2011 RR "recommended placement in a Life Skills program (or at least noted that [the Life Skills program] was recommended by the Student's teachers, if not the Student's IEP team) and continuation of the Speech and Language Therapy." (*Id.* at ¶ 36). Finally, the 2011 RR "concluded that the Student continued to qualify for special education as a child with a disability). (*Id.* at ¶ 37).

On February 14, 2011, Matthew's IEP team reconvened, and the District offered a NOREP providing that: (1) the 2010 IEP be continued for the remainder of the 2010-11 school year; (2) a "full-time Life Skills extended school year (ESY) program through the local Intermediate Unit in a neighboring school district during July 2011;" and (3) "[a]n itinerant Life Skills program for the Student in the District's middle school from the start of the 2011-12 school year through February 14, 2012." (*Id.* at ¶ 38). The Parents approved the IEP via a NOREP on that same day. (*Id.* at ¶ 39).

During the 2011-12 school year, the only IEP still in place was the 2010 IEP. (Doc. 14-2, at ¶ 40). Further, the Hearing Officer noted that "although the Parents approved an

itinerant Life Skills placement, in practice the Student received more. It is not clear if the Student received supplemental Life Skills or a full-time Life Skills Placement at the start of the 2011-12 school year." (*Id.* at ¶ 41). But, "it is clear that the Student immediately started the 2011-12 school year spending more than 20% of the day in Life Skills programming." (*Id.*).

Matthew's IEP team reconvened on February 7, 2012 and drafted a new IEP ("2012 IEP"). (*Id.* at ¶ 42). According to the present education levels in the 2012 IEP, "the Student's *functional* math abilities were at the 'early 4th grade' level" (*id.* at ¶ 43), "the Student was an excellent sight-word reader . . . [h]owever, the Student's reading comprehension of primer level material was 58%" (*id.* at ¶ 44). The 2012 IEP also noted that Matthew worked on pre-vocational skills, including Cooking, but required significant adult guidance. (*Id.* at ¶ 45). With respect to transition services, "the 2012 IEP continued to state that the Student did not plan on postsecondary education, would require supported employment, and intended to live with the family. Service and activities related to transition included functional reading and math, participation in a pre-vocational skills and domestic skills classes, community-based instruction, and completion of an interest inventory." (Doc. 14-2, at ¶ 46). With respect to academic goals, the 2012 IEP included "an updates [*sic*] Speech and Language goal" (*id.* at ¶ 47), "a functional math goal" (*id.* at ¶ 48), "a goal for the Student to know how to contact and use community resources" (*id.* at ¶ 49), "a goal for the Student to follow multi-step directions" (*id.* at ¶ 50), "a reading goal that targeted reading

comprehension" (*id.* at ¶ 51), and "a goal for the Student to make simple meals, following one or two step recipes" (*id.* at ¶ 52). The Hearing Officer noted that "[a]lthough the Student was now in a Life Skills program, the modifications and SDI provided through the 2012 IEP were substantively similar to those in the prior IEPs." (Doc. 14-2, at ¶ 53). Finally, the 2012 IEP also reflected that "the Student was eligible for ESY" (*id.* at ¶ 54) and "offered full-time Life Skills and itinerant Speech and Language support" (*id.* at ¶ 55). The Parents approved the IEP during the IEP team meeting on February 7, 2012, and Matthew received programming pursuant to the 2012 IEP for the remainder of the 2011-12 school year. (*Id.* at ¶¶ 56-58).

During the 2012-13 school year, on January 15, 2013, the District completed another reevaluation of Matthew ("2013 RR"). (*Id.* at ¶ 61). The 2013 RR incorporated information collected by teachers, new teachers, the Parents, and the Speech and Language Therapist. (Doc. 14-2, at ¶¶ 61-62). The Parents' opinion was "that the 2012-13 school year had been 'a bit of a repeat' for the Student, and that 'some work was too easy' and the Student 'should be challenged more.'" (*Id.* at ¶ 63). The teacher input indicated that "the Student was 'at an instructional level of early 4th grade' in academic math . . . up from the 3rd grade level reflected in the 2011 RR, but the same as the present levels indicated in the 2012 IEP, which had been in place for a bit less than a year at that point." (*Id.* at ¶ 64). "In contrast, teacher comments indicated that the Student was preforming [*sic*] better in functional math, but provided no objective information that rated the Student's functional math performance

relative to IEP goals." (*Id.*). Further, teacher input indicated that word identification remained a strength, but "the Student's reading comprehension ability . . . regressed." (*Id.* at ¶ 65). "Although the Student's reading comprehension score . . . regressed, the 2013 RR notes that the Student was participating in a 'small group functional reading program with a focus on community based sight words.' This was already a strength for the Student when the 2012 IEP was drafted, and reading comprehension remained an IEP goal for the Student even after the Student began attending the Life Skills program." (*Id.* at ¶ 66).

Matthew's IEP team convened on February 6, 2013, to draft a new IEP for Matthew for the 2013-14 school year ("2013 IEP"), which the parents approved, via a NOREP, on that same day. (*Id.* at ¶ 67). The Hearing Officer noted that the 2013 IEP was identical in many respects to the 2012 IEP, including regarding transition goals, math goals, multi-step directions (related to pre-vocational skills), reading comprehension goals, food preparation goals, and modifications and SDI. (Doc. 14-2, at ¶¶ 68, 70-74). The 2013 IEP also reflected the IEP Team's determination that Matthew was eligible for ESY during the summer of 2013, however, it only lists that "ESY services to be provided upon agreement between parents and school faculty" and lists the ESY placement as "to be determined." (*Id.* at ¶ 76). The 2013 IEP continued to provide a full-time Life Skills program with itinerant Speech and Language Support. (*Id.* at ¶ 78). Matthew received instruction pursuant to the 2013 IEP for the remainder of the 2012-13 school year. (*Id.* at ¶ 77).

On June 9, 2013, the Parents expressed their dissatisfaction with Matthew's program to the District and requested an independent educational evaluation. (*Id.* at ¶ 79). On June 11, 2013, the District invited the Parents to an IEP Team meeting, the purpose of which was to revise Matthew's IEP as needed and to convene a multidisciplinary team. (*Id.* at ¶ 80). The IEP team met on June 13, 2013, and "revised" the IEP. (Doc. 14-2, at ¶ 81). "On June 20, 2013, the District sought the Parents' consent to reevaluate the Student . . . relying upon existing information to determine if testing was warranted." (*Id.* at ¶ 82). On June 24, 2013, the Parents consented to the reevaluation. (*Id.*). The reevaluation took place during the 2013-14 school year, and a Report was issued on October 31, 2013. (*Id.* at ¶ 83). The Parents and the District also agreed to a psychiatric evaluation, which was conducted and reported in October 2013. (*Id.*).

Matthew began the 2013-14 school year under the revised 2013 IEP. (*Id.* at ¶ 84). On October 11, 2013, Matthew underwent psychiatric evaluation, and the medical doctor issued a report regarding the evaluation on the same day. (Doc. 14-2, at ¶ 85). The Psychiatric Report relied heavily upon information that was provided by Matthew's mother. (*Id.* at ¶ 86). The Psychiatric Evaluation reported that the Parents understood that Matthew had a relationship with another student of the opposite sex in the Life Skills class that had become problematic, and the District had intervened by separating them. (*Id.* at ¶ 87). But, the District's intervention caused Matthew to "perseverate more," which was corroborated by the evaluator's observations of the Student. (*Id.*). The Psychiatric Evaluation also

concluded that Matthew's full scale IQ was found to be a 70, with verbal IQ, performance, and memory in the high 60s, and processing speed at 105 (which is average). (*Id.* at ¶ 88). The Evaluation concluded that the District should conduct "a very specific [Functional Behavior Assessment (FBA)] which captures the dynamics across all of the environments in the school setting that have been identified as challenging." (*Id.* at ¶ 89). Moreover, the Evaluation concluded "that the Parents' efforts to secure services for the Student outside of school have been beneficial." (Doc. 14-2, at ¶ 90).

The District also completed another reevaluation of Matthew while he underwent the Psychiatric Evaluation, and a report was issued on October 31, 2013 ("October 2013 RR").[3] (*Id.* at ¶ 91). That evaluation was comprised of several tests, including a Behavior Assessment Scale for Children, an Adaptive Behavior Assessment System, the results from an FBA, and a Quality Reading Inventory ("QRI") administered in September 2013. (*See id.* at ¶¶ 97-100). Under the Behavior Assessment Scale for Children, completed by Matthew's Life Skills teacher in January 2013, the Hearing Officer noted that,

> nothing in the record sufficiently explains why the Life Skills teacher completed the BASC-II for the Student in January 2013, why only one rater is reported, or why the results were not reported at the time the BASC-II was completed. Regardless, the Life Skills teacher rated the Student in the "at-risk" range on the Behavioral Symptoms Index and Externalizing Problems. The teacher rated the Student in the "clinically significant" range for Internalizing Problems. "School Problems" and "Adaptive Skills'" were both rated in the average range.

---

[3] The Court notes that the Hearing Officer's decision refers to both the January 15, 2013 RR and the October 31, 2013 RR as the "2013 RR." To avoid confusion, the Court will refer to the January 15, 2013 RR as the "2013 RR" and the October 31, 2013 RR as the "October 2013 RR."

(*Id.* at ¶ 97). The October 2013 RR also included the results of an Adaptive Behavior Assessment System, completed by Matthew's Mother and his Life Skills teacher. (*Id.* at ¶ 98). The Hearing Officer noted,

> [t]he Student's mother rated the Student in the "below average" range (86, 13th percentile) for the General Adaptive Composite. The Mother's ratings produced similar scores for Conceptual Skills and Social Skills. The Mother rated the Student in the "average" range for Practical Skills (91, 27th percentile). The Life Skills teacher's ratings were lower across the board, placing the Student in the "borderline" range in the General Adaptive Composite (78, 7th percentile), the "extremely low" range for social skills (66, 1st percentile), and the "below average" range for practical skills (82, 12th percentile).

(*Id.*).

Further, the October 2013 RR included the results of an FBA, which drew hypotheses consistent with the Psychiatric Evaluation that "the function of the Student's behavior was to gain access from preferred people (the other student that the Student perseverated about) and attention from adults." (Doc. 14-2, at ¶ 99). Finally, the October 2013 RR included the results of a QRI administered in September 2013, which the Hearing Officer summarized as follows:

> The Student was found to be at the pre-primer level. Using pre-primer text, the Student read 25 words per minute with 99% accuracy and correctly answered 1 of 5 (20%) comprehension questions. These scores are significantly lower than prior QRI administrations at the primer level. However, at the same time, the Student could correctly identify 191 of 200 community sight words.

(*Id.* at ¶ 100).

In addition, to the testing results, the October 2013 RR reported that, in math, Matthew was instructional at the 2nd grade math level, according to curriculum-based assessments.

(*Id.* at ¶ 101). The writing sample included in the October 2013 RR showed that Matthew "did not show mastery of the IEP's written goal." (*Id.* at ¶ 102). The October 2013 RR also included observations from teachers and related service providers, where "[t]eachers reported that the Student was progressing through the functional curriculum, and using the functional skills that were instructed. The only difficulty reported by the teachers was Matthew's behaviors, which they viewed as a function of the Student's peer relations." (*Id.* at ¶ 103). In light of the above, the October 2013 RR "recommended continuation of the Student's current identification and program. The only change recommended in the October 2013 RR is the creation and implementation of a Positive Behavior Support Plan (PBSP) in response to the FBA." (*Id.* at ¶ 104).

On November 20, 2013, the IEP Team reconvened to further revise Matthew's 2013 IEP in light of the October 2013 RR. (Doc. 14-2, at ¶ 105). The District personnel on the team drafted and presented a revised IEP, but "the Parents refused to sign any document presented by the District other than a meeting adherence form." (*Id.*). The November 2013 IEP was substantively a continuation of the revised 2013 IEP, with the addition of the PBSP and a behavior goal, which provided that Matthew should use coping strategies to maintain certain age appropriate behaviors. (*Id.* at ¶ 106, 107). The IEP also included revisions to the transition services – the Hearing Officer noted that "the transition services section of the November 2013 IEP was revised, and became longer, but did not change in substance." (*Id.* at ¶ 109). The November 2013 IEP also changed Matthew's placement from full-time to

supplemental Life Skills without explanation. (*Id.* at ¶ 110). The District issued a NOREP with the November 2013, which the Parents refused to sign. (*Id.* at ¶ 111). Without the signature, the November 2013 became operative on November 29, 2013, and for the remainder of the 2013-14 school year. (Doc. 14-2, at ¶ 112). On February 8, 2014, the Parents declined the District's ESY offer. (*Id.* at ¶ 113).

Matthew started the 2014-15 school year under the November 2013 IEP. (*Id.* at ¶ 114). The IEP Team met on September 4, 2014, and the District issued a NOREP for the parents to approve the November 2013 IEP, which the Parents signed. (*Id.* at ¶ 115). The Team met again on November 17, 2014, for the annual IEP meeting, which resulted in an IEP ("2014 IEP") that was substantively identical to the November 2013 IEP, but with updated baselines to reflect some progress made in reading and math. (*Id.* at ¶¶ 117-19). The Hearing Officer noted that "[t]he updated baselines in the 2014 IEP indicated some improvement in the vocational multi-step direction following task. It is difficult to gauge the significance of that progress, because it was not reported objectively in relation to the goal or prior baselines." (*Id.* at ¶ 120). The 2014 IEP also indicated that Matthew qualified for ESY services, but "that the Parents rejected ESY services because they were not offered within the District." (Doc. 14-2, at ¶ 121). The Hearing Officer also noted that the "length of the transition services section of the 2014 IEP again increased but, again, did not change in substance." (*Id.* at ¶ 122). The 2014 IEP was offered with a NOREP, which the Parents refused to sign. (*Id.* at ¶ 123). The 2014 IEP became operative on November 27, 2014,

15

and Matthew received programming pursuant to the 2014 IEP for the remainder of the 2014-15 school year. (*Id.* at ¶ 124).

Matthew started the 2015-16 school year under the 2014 IEP, and Matthew's IEP team met on November 12, 2015, where the District offered the 2015 IEP. (*Id.* at ¶¶ 125-26). The 2015 IEP noted that Matthew was still instructional at a 3rd/4th grade level in Math and improved 6% on third grade materials during the prior school year. (*Id.* at ¶ 127). Progress in reading was similarly stagnant, as was progress in all other domains except behavior, where the Hearing Officer found that it was "impossible to determine what quantum of progress, if any, the Student made." (Doc. 14-2, at ¶¶ 127-28). The Hearing Officer also noted that the transition services section of the 2015 IEP again increased in length without any substantive changes (*id.* at ¶ 129), and the goals in the 2015 were "re-worded and aligned to the modest changes in the Student's present education levels but remained the same in substance" (*id.* at ¶ 130). The 2015 IEP was offered to the Parents with a NOREP, which they refused to sign. (*Id.* at ¶ 131). The 2015 IEP became operative on November 22, 2014, and Matthew received programming pursuant to the 2015 IEP for the remainder of the 2015-16 school year. (*Id.* at ¶ 132).

For the 2016-17 school year, Matthew was "placed on homebound instruction." (*Id.* at ¶ 133). The Hearing Officer noted that the "[d]ocumentary evidence of this placement is shockingly Spartan, consisting of almost entirely of two forms prepared by the District and completed by the Parents and the Student's primary care physician in August 2016 and

January 2017." (Doc. 14-2, at ¶ 134). While Matthew was homebound, he received approximately five hours of instruction per week. (*Id.* at ¶ 135). The Hearing Officer noted, "[t]he District did not evaluate the Student or otherwise convene the Student's IEP Team to determine whether or how the Student could transition back to school." (*Id.* at ¶ 136). During that time, Matthew participated in a vocational program at the Lehigh Valley Center for Independent Living. (*Id.* at ¶ 137).

In December 2016, Matthew received a comprehensive independent educational evaluation. (*Id.* at ¶ 138). The results were largely consistent with prior evaluations and concluded that, in addition to prior diagnoses, Matthew met the diagnostic criteria for an intellectual disability. (*Id.* at ¶¶ 139-40). At the end of the 2016-17 school year, Matthew turned 21 years old and aged out of programming. (Doc. 14-2, at ¶ 141).

Based on the documentary evidence and witness testimony during the administrative hearings, the Hearing Officer found that Matthew was denied a FAPE with respect to transition services and functional skills during the 2012-13 through 2015-16 school year, but not with respect to academics. (Doc. 14-2, at 27). The Hearing Officer reasoned that while Matthew made appropriate academic progress (*id.* at 26-27), the same was not true for Matthew's functional skills (*id.* at 27). The Hearing Officer noted,

> the relatively small amount of objective data regarding the Student's functional performance indicates stagnation. For example, word identification has always been a strength for the Student, and identifying functional and safety words in the community is unquestionably important. Progress data communicated through IEPs, however, shows that the Student mastered community sight words quickly. The District offers no explanation as to why this objective was

repeated year after year. The same is true for the Student's pre-vocational and
independent living goals. The data suggests some progress at first, and then
stagnation. Neither Student's IEP goals nor the Student's programming
changed in response to this stagnation. Moreover, nothing in the record
suggests that the Student's cognitive abilities are so impaired that the Student
is incapable of mastering basic pre-vocational and independent living tasks.

(*Id.*). The Hearing Officer determined that the "District's actions indicate that it believed that
the Student was capable of more" because the District agreed to greater demands on
academics and modified his program accordingly. (*Id.*). As such, the Hearing Officer
concluded that the District should have focused on pre-vocational goals, particularly when it
explicitly acknowledged that Matthew wanted some form of employment and made that part
of the IEP. But, it drafted pre-vocational goals, and ultimately did nothing with those goals
"when the Student's progress towards those goals flat-lined." (*Id.*).

The Hearing Officer reached a similar conclusion with respect to the transition
services. (Doc. 14-2, at 27). He noted, "[t]he transition services section of the Student's IEPs
simply state the Student's goals, and then, at best, refer to other sections of the IEP to explain
how the District will prepare the Student goals." (*Id.*).

The Hearing Officer reasoned that the violation began in the 2012-13 year, because
during that year, the District proposed – after Matthew did not make significant progress
during the 2010-11 and 2011-12 school years – the move from Learning Support to Life Skills
placement. (*Id.* at 28). The Hearing Officer stated, "[e]vidence in this case overwhelmingly
proves that a functional, as opposed to academic curriculum was what the Student required."
(*Id.*). Therefore, "[t]he District had every reason to believe that moving the Student to Life

Skills in the 2011-12 school year was appropriate." (*Id.*). Nonetheless, "[b]y the end of the 2011-12 school year, the District should have known that a substantively similar program would have produced similar results." (*Id.*). As such, beginning in 2012-13, Matthew was denied FAPE with respect to an appropriate functional program and appropriate transition supports. (Doc 32, at 28).

In 2016-17, however, the Hearing Officer concluded that Matthew was denied a FAPE completely. (*Id.*). The Hearing Officer found that the "District did nothing to determine what could be done to bring the Student back. Neither the Student's age, nor the poor relationship between the Parents and the District diminished the District's obligation to the Student during the entirety of the 2016-17 school year." (*Id.*). Accordingly, the Hearing Officer found that during the 2016-17 school year, the District provided Matthew with a *de minimis* program which, given his circumstances, the District had no reason to believe he would benefit from.

Based upon these findings, the Hearing Officer concluded that Matthew was entitled to compensatory education for the denial of a FAPE. (*Id.*). Nonetheless, the Hearing Officer noted that "calculating compensatory education is impossible in this case" because "[n]o evidence suggests what amount of compensatory education is needed to put the Student in the position that the Student would be in but for the denial of FAPE." (*Id.* at 29). As such, the Hearing Officer concluded that "hearing officers may fashion unique remedies to ensure that denials of FAPE are remediated" and sought a remedy that put the student in the "same

position" as if he were not denied a FAPE. (*Id.*). In light of the foregoing, the Hearing Officer fashioned the following remedy:

> I find that the appropriate remedy for this harm is placement in any transition program that teaches independent living or vocational skills to individuals of the Student's age and cognitive ability. The District must fund the instructional components of such a program for a period of no more than two years. The District is not obligated to fund the residential component of such a program, if any, or any other incidental expenses associated with such a program, or transportation to and from such a program. Nothing prohibits the District and Parents from working with each other to identify such a program, but the Parents may unilaterally select any program that satisfies these criteria. If the District is required to provide information to any such program as part of its application or intake process, the District shall provide accurate information without delay. The District [shall] take no action that bars the Students [*sic*] participation in any such program. However, if the District shall be held harmless for providing accurate information at the request of any such program, even if that information prompts the program to reject the Student.

(Doc. 14-2, at 29).

## IV. ANALYSIS

In its supporting brief for its motion for judgment on the administrative record, the District challenges the Hearing Officer's determination that the District denied Matthew a FAPE and that Matthew was entitled to any compensatory education. (Doc. 34, at 5). On the other hand, Matthew B and his Parents, in their brief in support of their motion for judgment on the administrative record, challenge the Hearing Officer's determination of compensatory education on the grounds that the Hearing Officer failed to award sufficient and appropriate relief. (Doc. 31, at 2-3). Both parties also argue that they are entitled to attorneys' fees. (*See* Doc. 31 at 30; Doc. 34, at 17). The Court will address each issue separately since each challenge to the Hearing Officer's determination involves separate considerations.

## A. The District's Denial of a FAPE

### i. *Legal Framework*

Congress enacted IDEA to "increase the personal independence and enhance the productive capacities of handicapped citizens." *Kruelle v. New Castle Cty. Sch. Dist.*, 642 F.2d 687, 691 (3d Cir. 1981). In its most general terms, the statute seeks "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

A "free appropriate public education" ("FAPE") must be "tailored to the unique needs of the handicapped child by means of an [individualized education program]." *Id.* (citing 20 U.S.C. § 1401(18)). "The IEP is . . . the 'primary mechanism' for delivering a FAPE." *Ridley*, 680 F.3d at 269 (quoting *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995)). "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of special services that the school will provide." *Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414(d)(1)(A)).

Under the IDEA, a school is not required to "maximize the potential of handicapped children." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (internal quotations omitted). Rather, to be compliant under the IDEA, "a school must offer an IEP

reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex. Rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 998 (2017). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999 (emphasis in original). "This standard is markedly more demanding than the 'merely more than *de minimis* test' . . . . It cannot be the case that the Act typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than *de minimis* progress for those who cannot." *Endrew*, 137 S. Ct. at 1000.

The Third Circuit's formulation of a school district's obligation, similar to *Endrew*, requires that "the educational program 'must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities.'" *Dunn v. Downingtown Area Sch. Dist. (In re K.D.)*, 904 F.3d 248, 254 (3d Cir. 2018) (quoting *Ridley Sch. Dist.*, 680 F.3d at 269). Put differently, the Third Circuit's test "requires an educational program 'likely to produce progress, not regression or trivial educational advancement.'" *Dunn*, 904 F.3d at 254 (quoting *Ridley Sch. Dist.*, 680 F.3d at 269).

Nonetheless, for a student who is not integrated into the regular classroom, the Supreme Court has noted,

> his IEP need not aim for grade-level advancement. But his educational program must be appropriately ambitious in light of his circumstances just as advancement from grade to grade is appropriately ambitious for most children

in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives.

*Endrew*, 137 S. Ct. at 1000. Again, the critical point is that "the IEP *must aim* to enable the child to make progress." *Id.* at 999. "A substantive standard not targeted to student progress 'would do little to remedy the pervasive and tragic academic stagnation' that prompted the passage of the IDEA." *Pocono Mountain Sch. Dist. v. J.W.*, No. 3:16-cv-0381, 2017 WL 3971089, at *9 (M.D. Pa. September 8, 2017) (quoting *Endrew*, 137 S. Ct. at 999).

ii. *Denial of a FAPE from 2012-13 through 2015-16 School Years*

The District argues that the Hearing Officer erred in concluding that the District denied Matthew a FAPE with respect to transition services and functional skills during the 2012-13 through 2015-16 school years because Matthew, at all times, received services appropriate for his circumstances. (Doc. 34, at 13). The District maintains that the Hearing Officer overlooked the many services that Matthew did receive, including development of pre-vocation skills in the classroom, "such as cooking, using money for purchases, how to contact and use community resources such as transportation, following multi-step directions, and increasing his understanding of community and household sight words, making a simple meal, and following one or two step recipes in support of his independent." (*Id.*). Further, "once he moved up to High School, the Student also participated at work sites located outside the District, including the library and local supermarket." (*Id.*).

The Court finds no basis for the District's argument. In its brief, the District does nothing more than provide a list of services and educational opportunities which it provided

to Matthew. More specifically, the District fails to address *how* and *why* what it provided to Matthew was appropriate under his circumstances. For example, the District states "[h]is transition services were appropriate for him" but the District fails to further explain that statement. (*Id.*). In sum, the District fails to address how the Hearing Officer's conclusion – that Matthew's IEP itself was deficient, *in light of the services he received* – is incorrect and instead, the argument it presents in its brief is conclusory and lacking in factual support or law

Moreover, the Court finds that the Hearing Officer was correct in concluding that Matthew was denied a FAPE for transition services and functional skills during the 2012-13 through 2015-16 school years. Based on the Hearing Officer's analysis of the record, the Court's own review of the record, and with no dispute raised by either party, it is clear that Matthew's program was supposed to be focused on transition services and functional skills. (Doc. 14-2, at 27). In reviewing Matthew's IEPs from 2011-12 through 2015-16, the Court finds that the Hearing Officer's was correct in finding that, "the District explicitly acknowledged that the Student ultimately desired some form of employment, and made that desire part of the Student's IEP in the transition section." (*Id.*). Further, in 9th Grade (2011-12 school year), Matthew was placed in a Life Skills program, as opposed to keeping him on a traditional academic track. (*Id.* at ¶ 8). Hence, as the Hearing Officer noted, it was at this point that the District was put on notice that a substantively similar program – i.e., a program that did not focus on progress in the Life Skills program – would produce substantively

similar and inadequate results. (*Id.*). Therefore, as the Hearing Officer concluded, beginning in the 2011-12 school year, transition services and functional skills were critical parts of Matthew's IEP. (*Id.* at 28 ("Evidence in this case overwhelmingly proves that a functional, as opposed to academic curriculum was what the Student required.")).

Taking the foregoing into account, the Hearing Officer identified several deficiencies with respect to the IEP in the transition services and functional skill areas between the 2012-13 and 2015-16 school years. (Doc. 14-2, at 28). As the Hearing Officer noted, Matthew's IEP repeated numerous goals despite the fact that Matthew had already nearly mastered them. (*Id.*). For example, each year, "understanding of community and household sight words" was considered a strength, and yet, year after year, it was also still a goal. (*Id.*). By way of another example, year after year, the transition services section of Matthew's IEPs similarly repeated the same goals, with little to no modification, and the section is in no way tailored to explaining how the District will help him attain the goals set forth – to receive on-the-job training for supported employment and to pursue supported employment upon graduation from High School. (*Id.*).

Thus, it sensibly follows that the Hearing Officer reached the conclusion that the IEP was deficient in that it failed to provide Matthew with an "appropriately ambitious" program with respect to transition services and functional skills, which are considered the fundamental aspects of Matthew's IEP. *Endrew*, 137 S. Ct. at 999. Although the District points to ways it believes it addressed Matthew's transition needs, its argument is entirely

conclusory as to why those transition services were (and remained over the course of several years) appropriate, despite, as the Hearing Officer finds, Matthew's stagnant progress.

Considering the testimony and documents presented at the due process hearing record, the District failed to offer Matthew an educational program that was "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *Dunn*, 904 F.3d at 254. Moreover, as the Hearing Officer found, "the District's actions indicate that it believed that the Student was capable of more." (Doc. 14-2, at 27). Thus, because the District believed Matthew was capable of more, and because the Hearing Officer reasonably found that the IEP was not reasonably calculated to benefit Matthew with respect to functional skills and transition services, it follows that the District denied Matthew a FAPE in those areas from the 2012-13 school year through the 2015-16 school year. *See Endrew*, 137 S. Ct. at 999.

The Hearing Officer's findings here are entitled to "due weight." *S.H.*, 336 F.3d at 270. Further, the Court is careful not to "substitute its own notions of sound educational policy." *Rowley*, 458 U.S at 206. However, the District bears the burden of persuasion here, and without any support to establish error on the part of the Hearing Officer, the Court cannot conclude that the Hearing Officer was incorrect in finding that the District denied Matthew a FAPE for the 2012-13 through 2015-16 school years.

### iii.   *Denial of a FAPE for 2016-17 School Year*

With respect to the 2016-17 school year, the District argues, in its supporting brief, that the Hearing Officer erred in concluding that Matthew did not receive appropriate services while he was Homebound. (Doc. 34, at 13, 15). Further, the District argues that the four hours of direct one-on-one academic instruction, one-hour a week of speech therapy instruction, and additional assignments were sufficient to enable Matthew to meaningfully progress. (Doc. 34, at 16). For the reasons that follow, the Court finds that the Hearing Officer's determination that the District completely denied Matthew a FAPE for the entire 2016-17 school year was correct for the reasons that follow.

The Hearing Officer concluded that the evidence established that Matthew experienced school-related anxiety. (Doc. 14-2, at 28). The Parents requested that Matthew be homebound because his "school related anxiety was severe enough to preclude [his] participation in school." (*Id.*). The District accepted that without challenge, and "did nothing to determine what could be done to bring the Student back." (*Id.*). Consequently, the Hearing Officer found that Matthew was denied a FAPE on the basis that "the program of homebound instruction offered by the District was calculated to provide no educational benefit to the Student." (*Id.* at 29).

Again, the District's arguments are almost entirely conclusory and devoid of any legal or factual support that undermine the Hearing Officer's decision. (Doc. 34, at 16). More specifically, the District only cited to some testimony, which it argues establishes that

"the Student in fact made progress under the goals and objectives of his Homebound IEP."
(*Id.* at 17). But, the District never establishes how that progress was meaningful and appropriate under the IDEA. Thus, the Court finds that this is insufficient to undermine the Hearing Officer's findings.

Moreover, the Court finds that the Hearing Officer properly found that the District denied Matthew a FAPE entirely for the 2016-17 school year. Indeed, "if a mentally disabled child continuously presents an adverse behavior that genuinely interferes with his ability to garner any real benefit from the education provided and the IEP does not adequately remedy this behavior, it stands to reason that the school district has failed to provide even a 'basic floor of opportunity,' much less the meaningful benefit required by our court.'" *New Milford Bd. of Educ. v. C.R.*, 431 F. App'x. 157, 161 (3d Cir. 2011) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010)).

Here, because Matthew's anxiety was school-related and otherwise prevented him from garnering any benefit from his education, the District had an obligation, as the Hearing Officer concluded, to create a program that provided some educational benefit and enabled Matthew to return to school. Nonetheless, the District failed to do anything other than provide a baseline education, from which the Hearing Officer found that Matthew derived no benefit from at all. (Doc. 14-2, at 28).

Again, the Hearing Officer's determination here that Matthew did not receive a meaningful benefit is entitled to "due weight." *S.H.*, 336 F.3d at 270. The District bears the

burden of persuasion to show that the Hearing Officer's decision was incorrect, and it failed to do so. In light of this, the Court finds that the Hearing Officer correctly determined that the District denied Matthew a FAPE for the 2016-17 school year.

## B. Compensatory Education

To compensate Matthew for the District's failure to provide a FAPE, the Hearing Officer required that the District fund the instructional components of any transition program, which the Parents may unilaterally select, that teaches independent living or vocational skills for a period of no more than two years. (Doc. 14-2, at 29). In their supporting brief, Plaintiffs contend that the Hearing Officer's award is insufficient and inappropriate, given the Hearing Officer's conclusion that the District failed to provide a FAPE for five years. (Doc. 31, at 7). Additionally, Plaintiffs contend that the Hearing Officer's an award has no legal basis. (Id.). Plaintiffs urge the Court to, instead, grant Matthew compensatory education for the five-year period of violations, convert that education into a monetary amount, and place the money in a fund or trust for Matthew's educational benefit. (Id. at 26). In the alternative, Plaintiffs ask the Court to order the District to fund both the instructional and residential portions of a program which the Parents have selected and fund the program for a total of three years, rather than two years. (Id. at 29). For the reasons that follow, the Court finds that the Hearing Officer's award fails to put Matthew in the position he would have been in had the

District provided a FAPE, and therefore the Hearing Officer fashioned a remedy that inadequately compensated Matthew for the District's IDEA violation.

Under the IDEA, courts are permitted to "grant such relief as the court determines appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The Supreme Court has concluded that "the only possible interpretation [of 20 U.S.C. § 1415(i)(2)(C)(iii)] is that the relief is to be 'appropriate' in light of the purposes of the act." *Burlington v. Mass.*, 471 U.S. 359, 369 (1985). To that end, courts have consistently awarded "compensatory education" as "a remedy to compensate [the student] for rights the district already denied . . . because the School District violated [the] statutory rights while [the student] was still entitled to them." *Lester H. v. Gillhool,* 916 F.2d 865, 872 (3d Cir. 1990). The Third Circuit has emphasized that "compensatory education serves to 'replace [] educational services the child should have received in the first place' and that such awards 'should aim to place disabled children in the same position they would have occupied but for the school district's violation of IDEA.'" *See Ferren C. v. Sch. Dist. Of Phila.,* 612 F.3d 712, 718 (3d Cir. 2010) (quoting *Reid ex. rel. Reid v. District of Columbia,* 401 F.3d 516, 518 (D.C. Cir. 2008)).

Although IDEA limits a school district's obligation to provide a FAPE to students under the age of twenty-one, "an individual over that age is still eligible for compensatory education for a school district's failure to provide a FAPE prior to the student turning twenty-one." *Ferren C.,* 612 F.3d at 718. Thus, courts "may grant compensatory education in such cases through its equitable power." *Id.*

To calculate a compensatory education remedy, the Third Circuit has held that "a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). However, this standard has been subject to a considerable range of interpretations between the courts of this circuit. As the court in *Jana K.* explained,

> [s]ome courts have interpreted this language as requiring full days compensatory education for the period of deprivation . . . . Indeed, numerous courts within this circuit have merely cited the *M.C.* court's language and awarded full days compensatory education for the period of deprivation with little, if any, additional consideration. However, other courts have interpreted this language as requiring a more particularized award calculated based upon the quantity of services improperly withheld during the period of deprivation, less the reasonable amount of time in which the school district should have addressed the deficiency. Consequently, these contrasting interpretations have led to a conflict within the Third Circuit.

39 F. Supp. 3d at 606 (Rambo, J.).

Additionally, in some instances, the Third Circuit has also adopted an approach that focuses on the equitable and discretionary nature of a compensatory education award. *See, e.g., Ferren C.*, 612 F.3d at 720 ("[W]e find nothing . . . that forecloses the type of equitable rewarded provided to Ferren by the District Court. Nor do we find case law from our sister circuits that supports the argument that a court's power to grant equitable relief under the IDEA is simply limited to monetary awards."). In *Ferren*, the Third Circuit affirmed the District Court's order awarding compensatory education to Ferren that required non-monetary relief, such as a requirement that the school district to provide an IEP with respect to Ferren's

compensatory education provided by another school and to serve as Ferren's Local Education Agency. *Id.* at 718. In doing so, the Third Circuit held that the District Court "had the power to award this type of specific non-monetary equitable relief, and that the award was appropriate under IDEA based on the facts of this case." *Id.*

In the case at hand, the Hearing Officer attempted to follow *Ferren C.* and fashioned a remedy that requires the District to fund only the instructional components of a transition program that teaches independent living or vocational skills to individuals of Matthew's age and cognitive ability for two years. (Doc. 14-2, at 29). However, the Hearing Officer provided no additional rationale to explain how he reached his determination that the remedy he fashioned fully compensated Matthew for the District's violations.

As noted *supra* at page 4, the Court's review over findings of law, including determinations of compensatory education, is plenary. Here, because the Hearing Officer's factual findings support a FAPE denial for five school years (a partial denial with respect to transition services and functional skills for four years, and a complete denial for one year), this Court perceives no basis for the Hearing Officer's decision to award only two years of instruction in a transition program and without any funding for the residential components of such a program.

The Court does not view the Hearing Officer's decision to only award two years of education as fully compensating Matthew for the District's violations. The Hearing Officer found that Matthew was partially denied a FAPE for four years, and then entirely for one year.

(Doc. 14-2, at 29). During the 2012-13 through 2015-16 school years, the Hearing Officer concluded that Matthew was denied a FAPE with respect to an appropriate functional program and transition services, which were supposed to be the focal points of Matthew's IEP. (*Id.*). Thus, considering Matthew's circumstances and the focus of his IEP, this amounts to a significant denial of a FAPE, even if the denial was only partial in that a FAPE was not denied as to Matthew's academic instruction. Although the Hearing Officer did not attempt to calculate what the partial denial of a FAPE amounted to in terms of hours of education, considering the foregoing, the Hearing Officer's award of compensatory education for two years, coupled with the limitations that the Hearing Officer imposed, appears inadequate to fully remedy the District's denial of a FAPE.

Furthermore, the Hearing Officer's remedy is deficient in that it does not consider the possibility of the need for residential and housing costs. In certain circumstances, courts have held that placement in a residential program is the only way for a student to receive a FAPE. *See, e.g., S.C. v. Deptford Twp. Bd. of Ed.*, 248 F. Supp. 2d 368, 379 (D.N.J. 2003) ("[I]n order to receive a FAPE, S.C. requires placement in a residential program.").[4] In Matthew's circumstances, he has aged out of programming, and thus in order to develop the skills he was deprived of from inadequate programming in functional skills and transition

---

[4] The Court recognizes that in *Carlisle Area School v. Scott P*, the Third Circuit indicated that residential placement, based on the facts of that case, was not the "least restrictive educational environment" and rejected the parents' claim for it. 62 F.3d at 535-36. Here, however, Matthew has aged out of programming. Thus, the Court does not see the least restrictive educational environment analysis as relevant to determining an adequate remedy for Matthew.

services, he may reasonably benefit from a program with a residential component. By categorically limiting the remedy to only the instructional components of an independent living and transition program, without further explanation, the Hearing Officer's remedy fails to consider a component of the remedy which may be necessary to enable Matthew to benefit from any compensatory education.

As such, the Court agrees with Plaintiffs that the Hearing Officer's compensatory education remedy is inadequate in light of Matthew's circumstances. Taking the foregoing into account, and remaining mindful of *Rowley*, "which cautions District Court Judges against substituting their own educational philosophies for those of the authorized state officials," this Court also treads carefully on reaching a specific remedy of compensatory education. *Blount v. Lancaster-Lebanon Intermediate Unit*, Civ. A. No. 03-579, 2003 WL 22988892, at *14 (E.D. Pa. Nov. 25, 2003)

To that end, the Court believes that it is most appropriate to remand the case to the Hearing Officer to fashion a proper remedy in light of the FAPE denial, this Opinion, and relevant Third Circuit authority. In *Carlisle Area School v. Scott P.*, the Third Circuit clearly held that there is no bar to judicial remand to the Hearing Officer. 62 F.3d at 526 ("Thus, while the statute clearly proscribes remands within the state's administrative system, we see no basis for prohibiting judicial remands."). Further, in the Third Circuit, remand is appropriate for clarification of the record and when a hearing officer applies the wrong legal standard. *Evan H. v. Unionville-Chadds Ford Sch. Dist.*, Civ. A. 07-4990, 2008 WL 4791634,

34

at *2 (E.D. Pa. February 18, 2009) (citing *Blount*, 2003 WL 22988892, at *6); *see also Shane T. v. Carbondale Area Sch. Dist.*, Civ. A. 3:16-0964, 2017 U.S. Dist. LEXIS 163683, at *51-52 (M.D. Pa. September 28, 2017) (remanding the case to Hearing Officer to consider remedy in light of facts and law that Hearing Officer did not initially consider).

Accordingly, the Court will remand the case to the Hearing Officer to fashion an appropriate remedy consistent with this Opinion and the relevant Third Circuit authority cited herein. In doing so, clarification of the record through additional proceedings may be necessary to shape a more particularized award, based on a calculation of the extent to which Matthew was improperly withheld services. Pursuant to this Opinion, the Hearing Officer should also take into account the determination that Matthew was denied a FAPE partially (though, still significantly) for four years and entirely for one year. Additionally, on remand, the Hearing Officer should re-assess what compensatory education, focused on life skills and transition services, is necessary to fully remedy Matthew for the District's denial of a FAPE and should determine whether Matthew should be placed with other students of his age, considering he is now over the age of 21 years old. Nonetheless, above all, the compensatory education must fully "compensate [the student] for rights the district already denied." *Lester H.*, 916 F.2d at 872. The Court thus returns the determination of the appropriate remedy to the Hearing Officer.

## C. Attorneys' Fees

In Plaintiffs' brief in support of their motion for judgment on the record, Plaintiffs also request attorneys' fees. (Doc. 31, at 30). On the other hand, the District "requests that the Court consider the parent's misuse of the procedures established under the IDEA as part of Matthew's circumstances and award attorneys' fees to the District on the ground that parent's complaint was presented for an improper purpose." (Doc. 34, at 17). The Court finds that the Parents are entitled to attorneys' fees and that the District is not entitled to attorneys' fees.

As an in initial matter, the District argues that it is entitled to attorneys' fees as a result of the "Parents' misuse of the procedures established under IDEA." (Doc. 34, at 17). In support of its argument, the District cites to 20 U.S.C. § 1415(i)(3)(B)(i)(III), which provides that a court "may award reasonable attorney's fees as part of the costs" to the district if the "parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation." (*See id.* at 25). Moreover, the District cites to only one case in support of its argument, *Bethlehem Area Dist. v. Zhou*, Civ. A. 09-cv-03493, 2013 WL 1415843 (E.D. Pa. April 9, 2013). (*Id.*).

The District's argument is, however, without merit. *Bethlehem Area Dist. v. Zhou* is inapposite to this case. In that case, the school district was the prevailing party at the due process hearing, and the parent initiated numerous due process hearings on the same

36

issues and requested due process hearings when other hearings were still pending. *Bethlehem Area Dist.*, 2013 WL 1415843, at *4. Here, on the other hand, the Hearing Officer expressly rejected the District's argument that the Parents interfered with Matthew's programs and thus used IDEA procedures in any inappropriate way. (Doc. 14-2, at 25). Moreover, the District failed to provide any additional evidence to suggest that the Parents initiated any frivolous due process hearings.

The District's argument also lacks merit on the grounds that Plaintiffs prevailed at both the due process hearing and in this instant action. Accordingly, the Parents' use of the procedures under IDEA was proper, considering they are entitled to relief. While the District points to the numerous instances of conflict between the District and the Parents, the Hearing Officer also concluded that "[t]he District, not the Parents, was responsible for the Student's programming . . . at all times." (Doc. 14-2, at 25). This Court agrees with that conclusion, and consequently, rejects the District's argument that it is entitled to attorneys' fees because the Parent's complaint was improper or frivolous under 20 U.S.C. § 1415(i)(3)(B)(i)(III).

Notwithstanding the above, under the IDEA, "[a] party who prevails on an IDEA due process complaint may file an action in the district court to recover reasonable attorney's fees and costs expended during the administrative proceedings." *A.B. v. Pleasant Valley Sch. Dist.*, No. 3:17-cv-02311, 2018 WL 1960382, at *2 (M.D. Pa. April 25, 2018) (citing 20 U.S.C. § 1415(i)(3)(B)). To determine whether a party "prevails," the Third Circuit has

adopted a two-part inquiry, which requires the court to determine: (1) "whether the plaintiff achieved some of the benefit sought by the party bringing the suit"; and (2) "whether the litigation 'constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief.'" *See Metro. Pittsburgh Crusade for Voters v. Pittsburgh*, 964 F.2d 244, 250 (3d Cir. 1992) (quoting *Dunn v. United States*, 842 F.2d 1420, 1433 (3d Cir. 1988)).

Here, Plaintiffs clearly meet both prongs of the test. At both the administrative level and in the action before this Court, Plaintiffs are entitled to relief through compensatory education. Furthermore, this underlying action, both at the administrative level and before this Court, is clearly the cause-in-fact of the relief granted to the parties. Accordingly, the Court finds that Plaintiffs are entitled to reasonable attorneys' fees and reasonable costs. In light of this, the Court will award Plaintiffs reasonable attorneys' fees but will reserve judgment on this issue subject to a proper petition of attorneys' fees at the conclusion of this case.

## IV. CONCLUSION

In conclusion, the Court will deny the District's motion, grant the Plaintiffs' motion, affirm the Hearing Officer's decision with respect to the denial of a FAPE, reverse the Hearing Officer's decision with respect to the issue of compensatory education, and remand the case to the Hearing Officer for a determination of an appropriate remedy consistent with this Opinion. The Court will reserve judgment on the issue of Plaintiffs' counsel's attorneys'

fees subject to a proper petition of attorneys' fees following the Hearing Officer's decision at

the conclusion of this case. A separate order shall follow.

Robert D. Mariani
United States District Judge